UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:18-cv-14166-RLR

JOSEPH J. THOMAS,

    Plaintiff,

v.

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, a
Wisconsin corporation,

    Defendant.
_____/

## DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), pursuant to Federal Rule of Civil Procedure 56, respectfully requests this Court grant final summary judgment in favor of Northwestern Mutual.

### I. Introduction and Background

The evidence in this case is undisputed and leads to the inescapable conclusion that there is no triable issue. Dr. Thomas, a dentist who stepped in a pothole and injured his back, has sought "total disability" benefits under his Disability Income Policy No. D785434 (the "Policy"). However, his own admissions and submissions to Northwestern Mutual during the claims process, as well as throughout discovery, make clear that he only satisfied the definition of "partial disability" under the Policy. SOF 15-18, 29-33. And, to be clear, for those months of "partial disability" for which Dr. Thomas submitted sufficient claim information, Northwestern Mutual approved Dr. Thomas for those "partial disability" benefits. SOF 20, 22. However, due to Dr. Thomas' failure to provide sufficient information to determine his income loss,

Northwestern Mutual was unable to determine any income loss he may have suffered.  SOF 19, 22 26.  Accordingly, as provided in the Policy for situations in which the insured is found to be unable to perform one or more of the principal duties of his occupation and has at least 20% Loss of Earned Income, but has failed to provide proof of a financial loss, Dr. Thomas was automatically paid 50% of the monthly benefit for that period.[1]

Importantly, at the time this lawsuit was filed (and to the present date) the claim administration process was not complete—Northwestern Mutual had outstanding requests to Dr. Thomas for both financial and occupational information.  SOF 19, 21-23.  One of the principal questions being asked was whether Dr. Thomas was *continuing* to perform procedures in a reduced capacity, as he previously had admitted, in his initial Request for Benefits as well as the ADA procedure codes[2] he submitted to Northwestern Mutual, that he was *continuing to work in his occupation, though at a reduced capacity.*  SOF 11-12, 21, 23.  Rather than respond to Northwestern Mutual's inquiries, however, Dr. Thomas chose to file this lawsuit, initially raising sweeping (and meritless) allegations of bad faith, which this Court dismissed as premature, leaving a single breach-of-contract count.  See Compl. [DE 1-2]; Order Dismissing Counts II-VIII [DE 22]; Order Denying Motion for Reconsideration [DE 30].

In what remains of the Complaint, Dr. Thomas advances two main "breaches" of contract, alleging that Northwestern Mutual:  "(a) fail[ed] to pay the full benefit due under [the Total Disability and, alternately Proportionate Benefit sections of] the Policy to Dr. Thomas; and

---

[1]  Specifically, Northwestern Mutual approved Dr. Thomas for a three-month period of Partial Disability from July 27, 2017 through October 27, 2017, because Dr. Thomas only submitted his employment records through July 2017.  SOF 13, 16, 17.

[2]  "ADA codes" are shorthand for the uniform billing codes of the Code on Dental Procedures and Nomenclature, which are approved by the American Dental Association and describe the dental activity being performed.  Dentists use these codes for billing purposes on the ADA Dental Claim Form.

(b) fail[ed] to continue benefits during Dr. Thomas' disability." Compl. [DE 1-2], at ¶30. As will be set forth below, the fatal defects in each require final summary judgment for Northwestern Mutual and dismissal with prejudice.

First, Dr. Thomas did not meet the definition for Total Disability under the policy because he admittedly was still performing some of the principal duties of his occupation by performing ADA procedures. SOF 11-14. In his Request for Benefits, Dr. Thomas admitted that, following his injury, was continuing to perform some of his job duties and continued to work in a reduced capacity in his occupation:

```
My disability first prevented me from working the usual duties and/or hours of my occupation(s) on  04 / 28 / 2017
                                                                                                      DATE
Since the above date:
  ☐ I stopped working and have not worked in any capacity in my occupation
  ☒ I have continued to perform some job duties and/or work in a reduced capacity in my occupation.
        From  04 / 28 / 2017  To  06 / 08 / 2017   to date
              DATE                 DATE
  ☐ There have been periods when I have not worked and periods when I worked in a reduced capacity in my
    occupation.
  Periods I did not work:
        From  ____ / ____ / ____  To  ____ / ____ / ____
              DATE                    DATE
        From  ____ / ____ / ____  To  ____ / ____ / ____
              DATE                    DATE
  Periods I worked in a reduced capacity:
        From  04 / 28 / 2017  To  06 / 08 / 2017  → to date
              DATE                 DATE
        From  ____ / ____ / ____  To  ____ / ____ / ____
              DATE                    DATE
```

Compl. [1-2], at CM/ECF p. 44; see also SOF 12. As can be seen from the image, above, Dr. Thomas did not indicate that he stopped working in any capacity in his occupation, and he did not identify any periods in which he did not work. Similarly, he admitted in his deposition that, subsequent to his injury, he continued to perform various dental examinations, dental procedures, and patient counseling. SOF 29-32.

Dr. Thomas' may argue that at various times dentists Dr. Naved Fatmi, Dr. Dorris Ferres,

Page 3

and Dr. Jason Witonsky (the "Volunteers") performed procedures on a volunteer-basis on Dr. Thomas' behalf (an argument that was not presented to Northwestern Mutual prior to this lawsuit being filed). This argument is highly suspect, as Dr. Thomas has absolutely no patient records, documents, calendars, billing records, or communications of any kind (nor do the Volunteers) corroborating that this actually occurred.  SOF 34, 36-39.  The billing records and ADA codes from his office indicate only he is performing the procedures, not the Volunteers.  SOF 14.  Even more suspect, Dr. Thomas has testified unequivocally that he has never compensated the Volunteers in any manner at any time, and that he has never undertaken the credentialing process required by his practice's health insurers in order to have the Volunteer-performed procedures reimbursed by said insurers.[3]  SOF 40.  Despite receiving this "free labor" from the Volunteers, Dr. Thomas also admitted that he continued to *receive all the income from the services the Volunteers performed.*  SOF 41.  In addition to this being a fairly incredible arrangement (the Volunteers do all the work, but he gets all the money), it also extinguishes Dr. Thomas' claim for even partial disability benefits, as, if he truly was not paying the Volunteers, but receiving all the income, he cannot demonstrate a loss of income,[4] a prerequisite to entitlement to partial disability benefits.[5]

Moreover, this "Volunteers did all the work" argument in no way saves Dr. Thomas'

---

[3] At one point in his deposition, when confronted with the insurance company billing provider agreement for Delta Dental that requires all treating dentists to be credentialed, Dr. Thomas asserted a Fifth Amendment privilege and refused to testify, stating he had a constitutional right not to testify and incriminate himself.  [DE 53-1], at 149:1-12; 152:12.

[4] "Earned Income" is defined as "the sum of salary, wages, commissions, fees, bonuses, and other compensation <u>or income earned by the Insured from all sources for work performed by him or others under his supervision or direction</u>; less normal and customary business expenses."  SOF 6 (emphasis added).

[5] The automatic "50% loss" provisions of the Policy, under which Dr. Thomas was paid initially, only applies to the first six (6) months of the claim.  Policy [DE 53-2] at CM/ECF p.10. After that time period, the insured must show an actual loss of income resulting from his disability.

breach of contract claim, because Dr. Thomas admits that he continued to perform dental examinations, procedures, and consultations. SOF 11-14, 29-33. Thus, he was still performing at least some of the principal duties of his occupation. Under the Policy's language, therefore, he could only meet the definition of "Partial Disability." SOF 28. Thus, he is not entitled to a full benefit resulting from a finding of Total Disability. SOF 18.

Under Dr. Thomas' alternate explanation for "Full Benefits," Dr. Thomas contends that even if partially disabled, he lost more than 80% of his earned income, which (if true) would entitle him to a "full benefit" under the Policy. A cursory review of Dr. Thomas' tax returns from 2013 through 2017 makes clear that he did not suffer a loss in income of more than 50%, as, according to his tax returns, he made only *de minimis* personal wages and salary, and his dental practice reported negative business income in all but one year from 2013 through 2017:

| Tax Year | Joint Personal Tax Return | Joseph J Thomas DDS PA Tax Return |
|---|---|---|
| 2013 | Wages and Salary: $278<br>Income: ($24,354) | Total Income: $45,828<br>Profit/Loss: ($93,248) |
| 2014 | Wages and Salary: $324<br>Income: ($62,650) | Total Income: $187,858<br>Profit/Loss: ($97,432) |
| 2015 | Wages and Salary: $93<br>Income: $42,146[6] | Total Income: $314,674<br>Profit/Loss: ($38,321) |
| 2016 | Wages and Salary: $185<br>Income: ($38,620) | Total Income: $404,107<br>Profit/Loss: $15,644 |
| 2017 | Wages and Salary: $93<br>Income: $1,254 | Total Income: $327,505<br>Profit/Loss: ($18,705) |

SOF 44-53. Thus, even if Thomas would not have prematurely filed this lawsuit (and if he had submitted complete financial information to Northwestern Mutual), his complete financial picture shows that he did not suffer more than a 50% reduction in his income at any time.

Second, Northwestern Mutual could not have breached a contract by "failing to continue benefits under the Policy" because Northwestern Mutual only approved Dr. Thomas for three (3)

---

[6]However, if Dr. Thomas' wife's gross income of $67,640 was not included in the joint return, their overall joint personal income would be negative in 2015 due to Dr. Thomas' dental practice's losses. SOF 48.

months of partial disability benefits (which Northwestern Mutual paid) based on the ADA codes spanning three months after the pothole accident.  SOF 15-16.  Dr. Thomas is not entitled to a continuing benefit in perpetuity.  He has an obligation to submit documentation to Northwestern Mutual. And at no time before the suit was filed did Dr. Thomas submit additional ADA codes going beyond July 2017.  SOF 24.  Instead, despite Northwestern Mutual's repeated requests for evidence that would indicate whether Dr. Thomas was working in a reduced capacity, Dr. Thomas simply did not respond.  SOF 21, 23, 25.

## II.  Policy Language

The Policy defines the "Beginning Date," as the date on which benefits begin to accrue:

> **Beginning Date.** This is the date on which benefits begin to accrue after the Insured becomes disabled. Benefits are not payable for the time the Insured is disabled before the Beginning Date.[7]

The Policy defines "Total Disability" as follows:

> **1.2 FULL BENEFIT FOR TOTAL DISABILITY**
>
> The Full Benefit is payable for each month of total disability between the Beginning Date and the end of the Maximum Benefit Period.
>
> **Total Disability.** Until the end of the Initial Period, the insured is totally disabled when he is unable to perform the principal duties of his occupation. After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

The "Initial Period" under the Policy is to October 26, 2025, as follows:

> Initial Period: To October 26, 2025, but not less than 24 months of benefits.

---

[7] The Policy states that the Beginning Date is the "91ST DAY OF DISABILITY IN THE FIRST 180 DAYS AFTER THE START OF DISABILITY."

The Policy defines "his occupation," as follows:

> 1.1 GENERAL TERMS
>
> . . . .
>
> **Occupation.** The words "his occupation" mean the occupation of the Insured at the time he becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time he becomes disabled will be combined together to be "his occupation".

The Policy defines "Partial Disability" as follows:

> **1.3 PROPORTIONATE BENEFIT FOR PARTIAL DISABILITY**
>
> The Proportionate Benefit is payable for each month of partial disability between the Beginning Date and the end of the Maximum Benefit Period.
>
> **Partial Disability.** The Insured is partially disabled when:
>
> > a. he is unable:
> > - to perform one or more of the principal duties of his occupation; or
> > - to spend as much time at his occupation as he did before the disability started;
> >
> > and
> >
> > b. he has at least a 20% Loss of Earned Income.
>
> Until the Proportionate Benefit has been payable for six months, the Insured need not have a 20% loss of Earned Income to be partially disabled if:
> > - he is unable to perform one or more principal duties which accounted for at least 20% of the time he spent at his occupation before the disability started; or
> > - he has at least a 20% loss of time spent at his occupation.

If the Insured qualifies for both the Full and Proportionate Benefit, the Full Benefit only will be paid.

The proportionate benefit is calculated, as follows:

### 1.4 HOW THE PROPORTIONATE BENEFIT IS DETERMINED

The Proportionate Benefit is intended to compensate for a loss of earned income caused by the Insured's disability. The amount of each monthly benefit is the Full Benefit multiplied by the Insured's Loss of Earned Income and divided by his Base Earned Income. Thus, the Proportionate Benefit amount equals:

$$\text{Full Benefit} \times \frac{\text{Loss of Earned Income}}{\text{Based Earned Income}}$$

However, if the Insured has at least an 80% Loss of Earned Income, the Proportionate Benefit amount will be 100% of the Full Benefit. In no event will the amount payable be more than 100% of the Full Benefit.

**Choice Of Benefit Amount For First Six Months.** For each of the first six months in which a Proportionate Benefit is payable, the Owner may choose:
• to receive 50% of the Full Benefit; or
• to receive a Benefit based on the Insured's Loss of Earned Income.

The Owner may alternate between these two choices as to each of the six months. However, the Owner may not change his choice after the Benefit is paid for that month.

The Choice of Benefit Amount does not apply to a Transition Benefit payable under Section 1.5.

**Loss of Earned Income.** This is:
• the Insured's Base Earned Income; less
• his Earned Income for the month for which the Benefit is claimed.

> The Loss of Earned Income must be caused by the disability for which claim is made.
>
> **Earned Income.** Earned Income is:
>
> • the sum of salary, wages, commissions, fees, bonuses, and other compensation or income earned by the Insured from all sources for work performed by him or others under his supervision or direction; less
> • normal and customary business expenses.
>
> It is determined before the deduction of federal, state and local income taxes.
>
> . . . .
>
> **Base Earned Income.** During the first 12 months of a disability. Base Earned Income is the average monthly Earned Income of the Insured for:
>
> • a 12 consecutive month period during the 24 month period before the start of disability; or
>
> • any two of the five calendar years before the start of disability.
>
> The period which generates the highest average (and therefore the highest benefit amount) will be used.
>
> . . . .
>
> **Proof Of Earned Income.** The Company may require proof, including income tax returns, of the amount of Earned Income for periods before and after the start of the disability.

Finally, proof of disability must be shown within 90 days, as follows:

> **4.3 PROOF OF DISABILITY**
>
> Written proof of disability must be given to the Company within 90 days after the end of each period for which benefits are claimed. If the proof is not given within the 90 days, the claim will not be

> affected if the proof is given as soon as reasonably possible. In any event, the proof required must be given no later than one year after the end of each monthly period for which benefits are claimed unless the Owner was legally incapacitated.

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Socas v. Nw. Mut. Life Ins. Co., 829 F. Supp. 2d 1262, 1265 (S.D. Fla. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see also Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001). Moreover, like the instant case, "[w]hen the motion is filed by a defendant and addresses the adequacy of plaintiff's causes of action, the defendant's burden is not to produce evidence negating the existence of material facts; rather, the burden is to point out the absence of evidence supporting the nonmoving party's case. Id. (quoting Compania de Elaborados de Café v. Cardinal Capital Mgmt., Inc., 401 F.Supp.2d 1270, 1274 (S.D.Fla. 2003)) (internal marks omitted); accord Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 913 (5th Cir. 1992), opinion corrected (Mar. 26, 1992).

### IV. Dr. Thomas is not "Totally Disabled" under the terms of the Policy.

The undisputed facts of this case establish that Dr. Thomas does not meet the definition of "Total Disability" under the Policy, as he has performed, and continues to perform, some of the principal duties of his occupation subsequent to his injury on April 24, 2017. In a virtually identical factual scenario dealing with a virtually identical Northwestern Mutual disability policy, the Southern District of Florida held that a dentist who continued to perform "some," but not "all" of her principle duties was not entitled to "total disability" benefits. Socas v. Nw. Mut.

Life Ins. Co., 829 F. Supp. 2d 1262, 1269 (S.D. Fla. 2011) (granting Northwestern Mutual's motion for summary judgment and holding "Dr. Socas' condition may be consistent with the definition of 'partial disability,' but it does not meet the standard for "total disability"). The Court in Socas based its ruling on a basic tenet of insurance policy interpretation, *i.e.*, that the policy's terms (here "total" and "partial" disability) must be read together, with an effort made to give effect to all the policy's provisions. Id. at 1270. Accordingly, to find an insured "totally disabled" while he was still performing "some" principle duties, *would, in effect, write the partial disability clause out of the Policy*. As stated by the Socas court:

> The undersigned finds the argument of Northwestern persuasive since, as explained by the Courts in [McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 588 (8th Cir.2002)] and [Karlin v. Paul Revere Life Ins. Co., 742 F.Supp.2d 1253, 1261–64 (D.Kan.2010)], the interpretation urged by Socas renders the "partial disability" definition superfluous; whereas the interpretation advanced by Northwestern gives effect to all provisions of the policy.

Id. at 1270.

In another case dealing with a Northwestern Mutual disability policy, the District Court of Maryland reached the same conclusion as in Socas, stating:

> Given the Court's determination that the principal duties of Plaintiff's occupation include more than just the performance of surgery, and there being no claim that Plaintiff's disability precludes him from performing those other duties, the only conclusion under the terms of the policies is that Plaintiff is partially disabled. Plaintiff's alternative argument, that he is totally disabled unless he can perform "all the substantial and material acts necessary to the performance of his former occupation," effectively eliminates the partial disability provisions contained in the policies. The policies clearly envision that where the insured "is unable to perform one or more but not all of the principal duties of the regular occupation," he is not totally disabled, but partially disabled.

Yahiro v. Nw. Mut. Life Ins. Co., 168 F. Supp. 2d 511, 517 (D. Md. 2001) (granting summary

judgment for Northwestern Mutual and holding that the plaintiff, "while undeniably partially disabled within the meaning of the policy at issue, . . . is not totally disabled").

Accordingly, under the Policy language at issue in this case, because Dr. Thomas can (and does) perform at least "some" of the principal duties of his occupation (as evinced by his "procedures by provider" and his own admissions), he does not meet the definition for Total Disability under the Policy. SOF 11-14, 24-26, 29-33.

## V. Dr. Thomas' Medical Records Are Irrelevant to Whether He Meets the Definition for "Total Disability."

Plaintiff may argue that his medical records are proof of his "total disability," pointing to records of his discectomy, lumbar fusion, or statements by Dr. Malloy, his treating physician, that Dr. Thomas' activities are restricted. Plaintiff's reliance on medical records is entirely misplaced. As the Court stated in Repass v. Nw. Mut. Life Ins. Co., 684 F. Supp. 2d 779, 781 (S.D.W. Va. 2009), yet another Northwestern Mutual case concerning a policy with an identical definition of "Total Disability," "[t]he medical evidence, however, is irrelevant to the court's analysis herein because, in determining disability, the Policy focuses on the activities of the insured and not what the medical evidence reveals about an insured's physical or mental condition." As set forth above, the evidence of Dr. Thomas' activities demonstrates that he is still performing some, if not all, of the principal duties of his occupation.

Further, even if some medical evidence from Thomas' treating physicians were relevant, Courts have already held a physician's statements, such as those made by Dr. Thomas' treating physicians, are insufficient to thwart summary judgment for Northwestern Mutual:

> As for Dr. William W. Dzwierzynski's statement that "Dr. Klein would have a disability from performing all the functions of his dental practice," we agree with the district court that this statement is not sufficient to defeat summary judgment. Regardless of how one interprets Dr. Dzwierzynski's comment, it cannot undermine the undisputed evidence that Klein is able to perform many of his

>     principal duties as a dentist, which is sufficient under the
>     unambiguous language of his policies to preclude Klein from
>     qualifying as totally disabled.

Klein v. Nw. Mut. Life Ins. Co., 337 Fed. Appx. 4, 6 (2d Cir. 2009) (affirming summary judgment for Northwestern Mutual and stating, *inter alia*, the "district court correctly determined that Klein does not qualify for total disability benefits under the policy").

## VI. Dr. Thomas is Not Entitled to Any "Partial Disability" Damages.

Assuming *arguendo*, if Dr. Thomas is Partially Disabled, he cannot show any damages. First, Dr. Thomas' testimony, which is consistent with the Volunteers' testimony, demonstrates Dr. Thomas did not pay the Volunteers compensation in any form. SOF 40. The services provided by the Volunteers (which are not documented and which Dr. Thomas cannot estimate, SOF 36-37) nonetheless constitute Dr. Thomas' Earned Income under the Policy, which is defined as "the sum of salary, wages, commissions, fees, bonuses, and other compensation or income earned by the Insured from all sources for work performed by him or others under his supervision or direction; less normal and customary business expenses." SOF 5-6 (emphasis added). Thus, by use of Volunteers in some capacity, Dr. Thomas has not suffered a loss in Earned Income.

Second, it is well-settled that Dr. Thomas' claim for "future benefits" fails as a matter of law under Florida Law because the claim has not yet accrued. Aetna Life Ins. Co. v. Smith, 345 So. 2d 784, 787 (Fla. 4th DCA 1977) ("Moreover, Plaintiff cannot claim entitlement to future benefits that have not yet accrued here."). The only benefits Dr. Thomas can sue on are those that are owed at the time the Complaint is filed.

Finally, Dr. Thomas cannot establish he is entitled to any damages due on the date the Complaint was filed, March 28, 2018. As of that date, Dr. Thomas had not submitted additional

ADA codes for procedures performed after July 2017, SOF 24, he had not responded to Northwestern Mutual's requests for his employment status, SOF 25, and he had not provided sufficient financial information to Northwestern Mutual that would allow Northwestern Mutual to calculate his base earned income and determine whether Dr. Thomas may have been entitled to a Proportionate Benefit above 50% of the "Full Benefit," SOF 26.  To be clear, despite Northwestern Mutual's requests for information, Dr. Thomas failed to provide sufficient support for his claim before filing the suit.  SOF 28.  Dr. Thomas bears the burden of present facts showing entitlement to coverage, which is black letter law.  See, e.g., LaFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516 (11th Cir. 1997) ("Florida law places on the insured the burden of proving that a claim against it is covered by the insurance policy." (citation omitted)).

Thus, between the date of filing the Request for Disability Benefits to the date of the Complaint—the only relevant timeframe for purposes of this suit—Dr. Thomas was not owed any benefits above what Northwestern Mutual already paid on December 8, 2017.  Dr. Thomas' breach of contract count fails, there is no genuine issue of fact to be tried, and final summary judgment for Northwestern Mutual is proper.

## VII. Conclusion

WHEREFORE, This Court should grant final summary judgment for Defendant, The Northwestern Mutual Life Insurance Company.

(remainder of page intentionally blank)

          Respectfully submitted,

**SHUTTS & BOWEN LLP**
*Attorneys for Northwestern Mutual*
200 South Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Tel: (305) 358-6300
Fax: (305) 381-9982

By: */s/ John Meagher, Esq.*
John E. Meagher
Florida Bar No. 511099
*jmeagher@shutts.com*
Jake Monk
Florida Bar No. 100321
*jmonk@shutts.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 14, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

          */s/John E. Meagher, Esq.*
          *Counsel for The Northwestern Mutual*
          *Life Insurance Company*

## SERVICE LIST

Michael O'Haire, Esq.
Ashley J. Novander, Esq.
O'HAIRE, QUINN, CASALINO, CHARTERED
3111 Cardinal Drive
Vero Beach, Florida 32963
(772) 231-6900
moh@oqc-law.com
ajn@oqc-law.com
kak@oqc-law.com
  *Attorneys for Plaintiff*

MIADOCS 17796251 5 N0009.0729